```
1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3

4     GUEST TEK INTERACTIVE          )
      ENTERTAINMENT LTD.,            )
5                                    )
                     Plaintiff,      )
6                                    ) C.A. No. 18-1394(RGA)
      v.                             )
7                                    )
      NOMADIX, INC.,                 )
8                                    )
                     Defendant.      )
9

10

11                                   Thursday, September 3, 2020
                                     2:01 p.m.
12                                   Discovery Dispute
                                     Videoconference
13

14    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15    APPEARANCES:

16              MORRIS NICHOLS ARSHT & TUNNELL LLP
                BY:  JENNIFER YING, ESQUIRE
17
                        -and-
18
                BAKER & HOSTETLER LLP
19              BY:  CHARLES C. CARSON, ESQUIRE
                BY:  ANDREW SAMUELS, ESQUIRE
20
                                     For the Plaintiff
21

22

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2              MORRIS JAMES LLP
               BY:  CORTLAN S. HITCH, ESQUIRE
 3
                        -and-
 4
               KNOBBE MARTENS OLSON & BEAR, LLP
 5             BY:  MARK LEZAMA, ESQUIRE
               BY:  ANDREA L. CHEEK, ESQUIRE
 6
                              For the Defendant
 7
                    ***  PROCEEDINGS  ***
 8

 9              THE COURT:  Good afternoon.  This is Judge

10    Andrews in Guest Tek versus Nomadix, Civil Action Number

11    18-1394.  I see my deputy clerk and my court reporter on the

12    line.

13              I'm assuming, though I do not see her, that

14    Ms. Ying is on the line representing the plaintiff, or maybe

15    somebody else is on the line representing the plaintiff.

16              MR. CARSON:  Your Honor, this is Charles Carson.

17    I'm on the line representing the plaintiff, Guest Tek, but I

18    believe she is on the line as well.

19              MS. YING:  Your Honor, this is Jennifer Ying

20    from Morris Nichols.  I apologize, I forgot to unmute the

21    application itself.  I am on the line for plaintiff, Guest

22    Tek, and I also am joined by my co-counsel, Chuck Carson and

23    Andrew Samuels from Baker Hostetler.

24              THE COURT:  Okay.  Thank you, Ms. Ying.  I

25    assumed you were out there somewhere.
```

1           And is Mr. Dorsney on the line?

2           MR. HITCH:  Good afternoon, Your Honor.  This is

3   Cortlan Hitch instead of Mr. Dorsney on behalf of Nomadix

4   from Morris James.  With me I have co-counsel, Mark Lezama

5   and Andrea Cheek from Knobbe Martens.  And I believe also on

6   the line is Kelly Hughes.  Mr. Hughes is Nomadix's general

7   counsel and will just be listening in.

8           THE COURT:  Okay.  So good afternoon to you all.

9   I read the four letters you submitted, Docket Items 109,

10  110, 111, 112, and I have considered what I understand from

11  those various letters.  And so I had a couple just general

12  questions because there's some amount of background I just

13  want to make sure that I sort of have in my mind in

14  determining all these things.  But basically once I get

15  through the background, what I was planning on doing was

16  going to the proposed orders that you all have submitted and

17  kind of using that as a guide for discussion.

18           So generally there's Canadian litigation over

19  some kind of Canadian counterpart patent.  Does that have

20  any date coming up in the future where the judge in Canada

21  is likely to decide the issues?

22           MR. LEZAMA:  Your Honor, this is Mark Lezama for

23  defendant, Nomadix.  Yes, there is a -- there's a bench

24  trial scheduled to begin September 28th, and it's a long

25  one.  I believe it's scheduled to end October 16th.

1      THE COURT:  Okay.  And would I be correct in

2  assuming that essentially that will have no impact, no

3  matter what the judge there decides, on what we're doing

4  here; is that right?

5      MR. LEZAMA:  Yeah, I would agree that on the

6  merits, the decision of that case will not affect the merits

7  of this case.

8      THE COURT:  All right.  So now there's also some

9  litigation going on in California; is that right?

10      MR. LEZAMA:  That is correct.

11      THE COURT:  And I'm guessing that's not patent

12  litigation, that's something else?

13      MR. LEZAMA:  It is a breach of contract action,

14  breach of a patent license agreement.  So those are

15  Nomadix's patents in that case.

16      THE COURT:  Ah, okay.  All right.

17      So realistically the decision in that case isn't

18  going to have any impact on this one, either; right?

19      MR. LEZAMA:  Unlikely.

20      THE COURT:  Okay.  All right.

21      So when did Nomadix start selling the products

22  that are accused which I understand to be, at least based on

23  the complaint, Nomadix Access Gateways 2400, 2500, 50 --

24  well, 600 -- I can't read my own writing -- 5800, 5900, as

25  well as software called Nomadix Service Engine and at least

1    versions 8.7 through 8.11?  When did you all start selling

2    that?

3              MR. LEZAMA:  So those specific -- I think the

4    limiting factor would be the version number, and I believe

5    8.7 was released in October 2016 if I -- I may have that

6    wrong, but I believe that to be the case.

7              THE COURT:  Okay.  Well, and I saw 2016 in one

8    of the proposed orders.  And that's kind of what I was

9    wondering is if the period of infringement that's alleged

10   essentially begins in 2016, and I take it from what you're

11   saying, Mr. Lezama, the answer, at least in your mind, is

12   yes?

13             MR. LEZAMA:  That is my understanding.  Just to

14   clarify, though, those models have been on sale before that,

15   you know, just not that version of software.  And Nomadix

16   has been selling gateways, you know, for more than 20 years,

17   and so there are predecessor versions of that as well.

18             MR. CARSON:  Your Honor, I can confirm that the

19   earliest version of the software that Guest Tek is accusing

20   was released in October 2016.

21             THE COURT:  Okay.

22             MR. CARSON:  So it's the boxes and the software

23   since that date that are accused of infringement.

24             THE COURT:  Now, I have the impression from the

25   letters that since the complaint was filed, Nomadix has --

1    updated may not be the right word, but has subsequent

2    versions of its software and maybe of its -- if the access

3    gateway is a hardware.  So are there new model numbers that

4    are now in this litigation by agreement of both parties?

5                MR. CARSON:  Your Honor, we served supplemental

6    paragraph 4A disclosures a few months ago that added the

7    more recent versions.  So that would be 8.12, 8.13, and

8    8.14.  And there's also a newer box.  I believe it's the EG

9    6000 that we also added.

10                THE COURT:  Okay.  And I take it the parties are

11    in agreement that those things are now in the case as

12    accused products?

13                MR. LEZAMA:  Yes.

14                THE COURT:  Okay.  Good.

15                All right.  So I also saw somewhere in the

16    briefing that Guest Tek has dropped three patents, the '599,

17    the '41 maybe nine and the '846.

18                Is that right?

19                MR. CARSON:  Yes, Your Honor.  We're currently

20    asserting three patents.

21                THE COURT:  Okay.  So I don't know.  I doubt

22    that it makes any difference here, but I had a total of five

23    others left.  Which are the other two you're dropping?  Or

24    maybe tell me what the three are that are left.

25                MR. CARSON:  That will be easier, Your Honor,

1    here on the spot, although I could get the numbers we

2    dropped.  The three that we're keeping are the '435, the

3    '738, and the '681 patents.

4              THE COURT:  Okay.  So you've dropped the '184

5    and the '640.  But in any event, there's nothing actually in

6    the record to say that you've dropped these five patents, is

7    there?

8              MR. CARSON:  Well, there is our most recently

9    supplemented paragraph 4A disclosures.

10             THE COURT:  Okay.  But you don't file those with

11   the Court.

12             MR. CARSON:  No.  No.  Those were served on the

13   other party.  We have -- there's nothing -- other than our

14   notice of service of that document, there's nothing in the

15   Court's docket that reflects this.

16             THE COURT:  Well, so why don't you clean up the

17   record by submitting something indicating that those five

18   patents are now out of the case.  You can work maybe -- I

19   mean, that would be helpful.  Okay.  And we talked about

20   accused products.

21             All right.  And so I take it, also, dealing with

22   one of the perhaps less disputed points is basically if I

23   continued the discovery until October 30th, given that I've

24   already built enough space into the schedule so that you can

25   bump everything else back by six weeks or so and still give

1    me the amount of time that I like to have to deal with your

2    summary judgment motions and Daubert motions and still have

3    the trial date that I've given you in September of 2021 --

4    you know, I know one side or the other wanted to put

5    conditions on this, but can't we just agree that we'll do

6    that?

7              MR. CARSON:  That's fine with the plaintiff,

8    Your Honor.

9              MR. LEZAMA:  So Nomadix's position -- I guess I

10   should say we probably need to back off a little bit from

11   the position that we expressed in the letter.  The Canadian

12   court was setting the schedule for the trial roughly

13   simultaneously as we were preparing that letter.  We didn't

14   fully appreciate the impact of that case schedule on our

15   discovery schedule here.

16             And our strong preference is just to finish up

17   discovery by the 22nd as planned because it's going to be a

18   three-week long trial in Canada that's going to occupy a

19   significant amount of time of Nomadix's employees and

20   Nomadix's general counsel, the 15 individuals who are most

21   likely to be involved in discovery here in the Delaware

22   case.  And it's a huge time commitment for them in Canada.

23   You know, we need to get them back to work.  We would -- it

24   would be our strong preference to wrap up discovery as

25   originally scheduled.

1          THE COURT:  Well, so I have a feeling that's

2     probably not going to be possible, but why don't we hold

3     that thought and move on to these more specific disputes

4     because I think I can resolve them or hopefully resolve most

5     of them.

6          So I'm going to deal first with Guest Tek's

7     letter which raised various issues.  And so Guest Tek wants

8     you, Nomadix, to produce and then it has a list of by

9     September 11th of 2020, though there's no particular magic

10    on a date.  And in fact, that seems kind of unrealistic if

11    there's actually much for you to do here.

12          But in any event, they want you to produce

13    various things, and the first nine of them have to do with

14    financial documents.  And I think what they're trying to do

15    is, you know, get information that's necessary for their

16    damages expert to perform a reasonable royalty analysis.

17    And their complaint seems to be mostly that you've produced,

18    you know, a four-page document for each year that purports

19    to be all the information they need or maybe it doesn't

20    purport to be.

21          Do I have the general gist of what the dispute

22    is here right?

23          MR. CARSON:  Your Honor, you do.  What they've

24    produced, though, is not four, four-page documents, but four

25    single-page documents.

```
 1                    THE COURT:  Oh.
 2                    MR. CARSON:  Those are annual profit loss
 3       statements.  They're single-page documents.  They're
 4       companywide.  We've got those documents.
 5                    There are additional financial documents, none
 6       of the documents that we identify in our letter.  There are
 7       a very large collection of individual purchase invoices
 8       that --
 9                    THE COURT:  Well, so let me ask you about that
10       because if I wanted -- who are Nomadix's customers?  Are
11       they businesses?  Individuals?  Who buys these gateways and
12       the software?
13                    MR. CARSON:  Are you asking me that, Your Honor,
14       or are you --
15                    THE COURT:  Well, I'm asking anybody who knows
16       the answer.
17                    MR. CARSON:  Okay.
18                    MR. LEZAMA:  I can respond, Your Honor.  So
19       Nomadix's customers are distributors and resellers, so
20       that's who we sell the devices to --
21                    THE COURT:  Well, who do the --
22                    MR. LEZAMA:  -- ultimately.
23                    THE COURT:  -- distributors and resellers sell
24       it to?
25                    MR. LEZAMA:  So ultimately the resellers will
```

1   tend to sell them in a couple of different verticals.   One

2   of those verticals is the hospitality industry.   So there

3   are a lot of hotels that have Nomadix's gateways installed.

4   And there are also, you know, other businesses that could be

5   cafes.   They could be university campuses.   They could be

6   apartment complexes, condominiums, and things like that, but

7   we don't deal with those entities.   We have our distributors

8   and resellers.

9              THE COURT:   And so does Nomadix sell products

10   other than the accused products in this case?

11             MR. LEZAMA:   Very few.   So there are one or two

12   product lines that are not accused and for which we have

13   very small sales.

14             THE COURT:   Okay.

15             MR. LEZAMA:   So --

16             THE COURT:   So when a distributor buys a -- do

17   they buy sort of individual gateways with a software

18   package?

19             MR. LEZAMA:   That's correct.

20             THE COURT:   So what kind of price range are we

21   talking about if I'm a distributor, and I want to buy one of

22   these things from you?

23             MR. LEZAMA:   It depends on the model and the

24   software that's purchased, but it's generally, you know, █

25   ███████ , kind of somewhere in that range.

1          THE COURT:  Okay.  And generally speaking, how

2     many of these units are you selling in a year like 2019?

3          MR. LEZAMA:  You know, I hesitate to give a

4     number because I'm not sure it would be accurate.

5          THE COURT:  Well, give me --

6          MR. LEZAMA:  I apologize.

7          THE COURT:  So I'm not holding you to be

8     accurate, but give me an order of magnitude.

9          MR. LEZAMA:  I mean, I think it would be ███████

10    ███████.

11         THE COURT:  Okay.  And Mr. Carson, have you

12    gotten any discovery on how much of these units they've

13    sold, or is this the first time you're ever hearing what

14    this is?

15         MR. CARSON:  We did serve an interrogatory

16    response, and they did provide some of this raw units and

17    sales data.  It's specific to the boxes, though, and we

18    understand that there is a separate or related revenue

19    stream with respect to the software.

20         So we don't have the software piece.  We only

21    have the boxes.  And even that particular data, that

22    doesn't -- you know, that only goes to units and revenue.

23    It doesn't address the cost associated with those, and so it

24    doesn't address the compensability.

25         THE COURT:  Well.  So yeah, Mr. Carson, I'm just

1    trying to get a handle here because one of the things

2    somebody, Nomadix said is proportionality.  And they said,

3    well, it costs $90,000 to do some discovery that they've

4    already done.  But it's hard to have proportionality unless

5    you know what the denominator is or at least have an idea

6    what it is.  So that's the reason I'm asking.

7              So Mr. Lezama, not holding you to these numbers,

8    but when you say ████████ -- I think you said ████████████████

9    units, that's of all the different models in a single year.

10   So --

11             MR. LEZAMA:  That's correct.

12             THE COURT:  -- like if I took ████████ and

13   multiplied it by ████████, and ████████████████████████

14   ████████ a year?

15             MR. LEZAMA:  No, I think it's more.  I said

16   ████████████████████ actually, so --

17             THE COURT:  But somewhere like in the ████████

18   ████████████ range is probably --

19             MR. LEZAMA:  Yes.

20             THE COURT:  -- the gross revenues from all the

21   sales of all of these in a year?

22             MR. LEZAMA:  Yeah, if you're not holding me to

23   it, that sounds like in the ball park.

24             THE COURT:  Okay.  So you know, Mr. Carson asked

25   or wants me to consider the relevant question here which is:

1    Do you have a sense of what the ball park of profits are?

2              MR. LEZAMA:  I don't personally.  I mean, I'm

3    sure Nomadix does.  The --

4              THE COURT:  Well, so you've given him a one-page

5    sheet that's supposed to be the financial information for a

6    year.  And it seems to be the case that the sale of the

7    accused products is going to be, you know, 95 percent of

8    whatever the one-year numbers show.  I'm assuming somebody

9    on your side has looked at the piece of paper you gave them

10   or paper -- you can tell my age when I say paper.  But

11   you've looked at the numbers.

12             I mean, or Mr. Carson, you've got a page.

13   Presumably it shows something that represents profit.  I

14   don't want you to tell me the specific number that's written

15   down, but what kind of a ball park are we talking about?  I

16   would imagine that if we ball parked ███████████████ in

17   revenue, you know, profits are probably, you know, ████████

18   ██████ plus or minus.

19             MR. CARSON:  Well, we attached one of these

20   profit loss statements as an exhibit to our brief last week,

21   and that's a statement which I'm looking at right now for

22   the -- I guess the calendar year ending December 2016.  So

23   this is a while back.  And you know, the total operating

24   profits --

25             THE COURT:  So December of 2016 when they only

 1    started in October of 2016, that's not the best year to be

 2    looking at.  Do you have a different year?

 3              MR. CARSON:  Well, that's the sample that we

 4    provided to you so that you'd have a sense of the document

 5    that we got.  I can certainly get that.

 6              THE COURT:  Well, so I didn't look at that

 7    document.

 8              MR. CARSON:  Okay.

 9              THE COURT:  That's the reason why I'm asking

10    now.

11              MR. CARSON:  I can pull it up very quickly if

12    you can hold on just a moment.

13              THE COURT:  Well --

14              MR. CARSON:  I --

15              MR. LEZAMA:  While he's doing that, I just want

16    to make clear that, you know, we don't necessarily agree

17    with their characterization of that, that that's the extent

18    of what we've produced that's relevant here.

19              THE COURT:  Yeah.  So you know, I don't really

20    expect them to take all your invoices -- and I understand

21    you say, well, they asked for it.  I don't really expect

22    them to take all your invoices and put them together and

23    reconstruct your financial records.  So you know --

24              MR. LEZAMA:  We have produced annual sales

25    reports and --

1          THE COURT:  Can you tell the profit that you

2     make on the sale of these things from those?

3          MR. LEZAMA:  I don't think so.

4          THE COURT:  Yeah.  So that's my impression is

5     you said in your letter, We don't keep track of profits

6     which, you know, strikes me that most businesses who don't

7     keep track of profits don't stay in business very long.  But

8     maybe Nomadix is different.

9          Is it really the case that you all don't keep

10    track of profits?

11         MR. LEZAMA:  Well, I think there is a

12    misunderstanding here.  What they have asked for and what

13    they're seeking is documents that specify our profits on a

14    per-product basis.  So you know, we do not have that.  That

15    would require a substantial analysis.  It's a very stable

16    business that we have that -- you know, we've been doing

17    this for 20 years.  We know what our costs are.  And we

18    know, you know, how profitable it is.

19         And as you pointed out, you know, the vast

20    majority of our business is the sale of these gateways.  And

21    so we don't know, you know, how much.  We don't have

22    documents that analyze what's the profit on 18 2,500 versus

23    the 5600.  That's my understanding after multiple

24    discussions with the client.

25         THE COURT:  So if Mr. Carson, his expert down

1    the road says, well, they don't keep track of profits on a

2    per-unit basis, so I just took the profit margin for the

3    company as a whole which is, you know, 95 percent based on

4    these things.  And I took the prices for which they're sold

5    and I just pro rata distributed the products, would you say,

6    yep, that's a fine method of analysis?

7                    MR. LEZAMA:  No, I don't know that we

8    necessarily would agree with that.  We have to consult with

9    Nomadix and talk to our expert and see if that's valid, but

10   that's not really the point respectfully.  I mean, we're

11   talking about document production.  They have multiple other

12   avenues of getting this discovery.  We just can't produce

13   what we don't have.  I mean --

14                    THE COURT:  Yes.  Well --

15                    MR. LEZAMA:  -- we can only produce --

16                    THE COURT:  What is the other avenue you'd like

17   to propose for them to find this out?

18                    MR. LEZAMA:  Well, they could serve

19   interrogatories.  They could take our deposition.  I mean,

20   we have less than three weeks to go in the fact discovery

21   period, and they haven't noticed a single deposition.

22                    THE COURT:  Okay.  All right.  So --

23                    MR. CARSON:  Your Honor.

24                    THE COURT:  -- Mr. Carson, did you want to say

25   something?

1          MR. CARSON:  Yes.  I just wanted to address that

2     point a bit here.  So you know, what they've produced for

3     2016 to 2019 are these single-page profit loss statements

4     that we're talking about, you know, as part of their

5     production.  And this is in the briefing, and I know you

6     don't want us to rehash the back and forth, you know, battle

7     between the parties over discovery, but you know, prior to

8     their production yesterday, which I assume we're going to

9     talk about here in a minute, the vast majority of the

10     documents that they've produced were recycled from an old

11     case, a ten-plus-year-old case.  And the only reason I raise

12     that is because if you look through that production -- and

13     they're not easy to find because there's no metadata, it's

14     voluminous -- if you look through that, though, you will

15     find some financial statements from Nomadix's profit loss

16     statements from the 2006 to 2009 time period, so more than

17     ten years ago, that do provide significantly more detail

18     than the single-page statements that we got for 2016 to

19     2019.  They're not product specific, but they do suggest

20     that at least ten years ago, Nomadix had more data than

21     they're providing to us.

22          And then the other point that I want to make --

23          THE COURT:  Well, so Mr. Carson on that, you

24     know, while I tend to agree with you that I find it hard to

25     believe that a business that you know, has revenues, let's

1    say, in the ███████████████ range gets one page of, you

2    know, that's our financial analysis, you know, I can't --

3    what I'm inclined to do, not just because Mr. Lezama said

4    it, but because there's limits to what I can do is I was

5    going to suggest, you know, do a 30(b)(6) deposition and

6    find out if there are any other documents.  And you know, if

7    there are later, come back and get some sanctions.

8                   But any way, I interrupted.  That's one point.

9                   What's your other point?

10                  MR. CARSON:  Well, so I'd like to respond to

11   that, but the fact that they're able to generate these

12   reports suggests that they've got the underlying data

13   somewhere.  And you know, we're -- I mean, the parties are

14   in dispute as to what exactly was said during a meet and

15   confer a couple weeks ago, but we understood counsel for

16   Nomadix to say that there is a database that contains the

17   underlying financial data, but that they don't regularly

18   generate reports.

19                  And the question was asked:  Well, do they

20   generate reports on an ad hoc basis for internal analysis,

21   and providing to shareholders, and things like that, and the

22   answer was that they've asked and apparently not.  And so --

23   but you know, I don't know how you generate these reports

24   without the underlying data.  But you know, I'm not

25   questioning what Mr. Lezama has said today about the

1   documents not existing.  And I take your suggestion that

2   there be a 30(b)(6) deposition.

3            A suggestion that I have in advance of that and

4   I think there's precedent for this is that Nomadix -- that

5   someone from Nomadix, a customer, a financial person be

6   required to provide a sworn declaration that describes

7   exactly what they've done to collect documents, what exists

8   in terms of financial documents, so that we know directly

9   from Nomadix before we get into a deposition, you know, what

10  exactly the situation is within the company with respect to

11  these financial documents.  Because like you, you know, it

12  just seems kind of implausible that a company would not have

13  more documents then they have.

14           And again, I'm not questioning Mr. Lezama's

15  statements today in any way, but I think the quickest way to

16  get to this and the most efficient way would be to require

17  some sort of sworn declaration from someone at Nomadix who

18  knows to describe what they have, how they keep track of

19  this, and what they've looked for in terms of responding to

20  these requests.

21           THE COURT:  Okay.  Well, that's not a terrible

22  idea for sure, but I'm not going to do that.  You know, you

23  need to get to a live person because, you know, a

24  declaration, an affidavit, whatever it is, it's going to be

25  heavily gone over by lawyers.  And you know, you're going to

1    be still wanting to follow up when it's done, so you might

2    as well just cut to the chase and find out what they have.

3             And the other thing is, you know, find out

4    whether this underlying data system, how easily manipulable

5    it is.  Because if it turns out that, you know, you can

6    produce this report, you just have to say hold this

7    variable, hold that variable, or do something, yeah, I'm

8    going to order them to produce it.  But you don't know what

9    they have, I don't know what they have, and I'm not entirely

10   sure Mr. Lezama knows what they have.  So that's what I'm

11   going to do about the financial information is do a

12   Rule 30(b)(6) deposition, do it promptly.  And after you

13   find out what it is they have, if anything, that they

14   haven't produced that would be helpful to you, you know,

15   talk to Mr. Lezama and see if they'll just produce it.

16            But if, in fact, they don't have anything more,

17   but you learn that they can, without much effort, produce a

18   report, you know, I'm going to order that they produce it.

19            All right.  So let's move on.

20            MS. CHEEK:  Your Honor, if I may, this is Andrea

21   Cheek on behalf of Nomadix.  I'm happy to address the

22   contents of the database in more detail if that would be

23   helpful at this point.  If you'd prefer for us to discuss it

24   offline with Guest Tek's counsel --

25            THE COURT:  So I appreciate, Ms. Cheek, the

1    offer, but you know, there's a lot of disputes here, and I'm

2    not actually going to spend all afternoon addressing them.

3    So I think you ought to discuss them offline, but I do

4    appreciate the offer.  Thank you.

5              All right.  So there's a second area of which

6    has to do with testing, and you know, it's unclear to me

7    what it is that plaintiff specifically thinks there should

8    be that has not been produced other than I gather you've

9    gotten nothing relating to testing; is that right?

10             MR. CARSON:  That's right.  Could I address that

11   point more generally?

12             THE COURT:  Well, but do it quickly.

13             MR. CARSON:  Okay.  So very quickly.  You know,

14   it's really design, development, and testing.  Testing is

15   kind of the culmination of that when you test the new

16   feature in a real-world environment.  But just to frame the

17   issue very quickly, the core functionality in this case is

18   what Nomadix refers to as share unused or the distribution

19   of unused bandwidth.  And that's been our contention from

20   the beginning.

21             Those are primarily the documents that would be

22   relevant to our claims.  And as of July 1st, two months ago,

23   if you set aside a user guide and a press release, Nomadix

24   had produced exactly zero documents that related to share

25   unused.

1          They had a production on July 9th that purported

2    to fix that.  And again, if you set aside press releases and

3    user guides, we got eight documents that relate to that

4    feature.  Eight documents, other than the source code, that

5    relate to the core feature in this core functionality that

6    we've accused.

7          Now, yesterday at 12:30 a.m., they produced

8    nearly 300,000 pages.  And you know, we haven't reviewed

9    that, but it does appear that --

10         THE COURT:  You haven't?

11         MR. CARSON:  No.  I apologize, Your Honor.

12   We've not fully vetted those documents.

13         THE COURT:  Sorry.  I'm trying to be funny here.

14         MR. CARSON:  And I'll wrap up here very quickly.

15   There are -- it does appear that there are a significant

16   number of documents in that production that go to this core

17   functionality.  And you know -- and I don't know what's in

18   there yet.  I don't think it's the technical and testing

19   documents that we're looking for.  I think it's

20   correspondence with their customers, their hotel clients --

21         THE COURT:  That you asked for?

22         MR. CARSON:  That we've also asked for regarding

23   this functionality, but the point is their production is

24   dated.  This functionality was not introduced until

25   October 2016.  There are very, very, very few documents in

1    their production that relate to this, none that relate to

2    internal design, development, and testing of the feature.

3    And it's those documents that we think we're entitled to.   I

4    mean, we are entitled to them.  We've asked for them.  We've

5    never been told they don't exist.

6              THE COURT:  Okay.  I've got your point.

7              For Nomadix, Mr. Lezama or Ms. Cheek.

8              MS. CHEEK:  Yes, Your Honor.  This is Andrea

9    Cheek.  I will address this point.

10             And just a few things.  First, Mr. Carson

11   describes it as a core functionality of Nomadix's product.

12   I think it's a core feature of their infringement

13   contentions, but not necessarily a core feature of Nomadix's

14   product.

15             And so while we understand their desire for more

16   documents, we have searched for and we have conducted a

17   reasonable search and produced documents related to the

18   functionality.  Additionally, we've produced all the

19   versions of the source code that have been accused that have

20   all the, you know, possible details about the functionality

21   that they would --

22             THE COURT:  Well, so Ms. Cheek, that's all good.

23   Is it the case that Nomadix puts source code and

24   functionality out there, whether it's the core or not,

25   without testing it?

```
 1                   MS. CHEEK:  So in one of our recent productions,
 2      I don't know if it was.  This most recent one or a prior
 3      one, we did produce a document that is a fairly
 4      comprehensive compilation of testing that has been conducted
 5      on the accused products.  And I understand that they may not
 6      have had a chance to review that yesterday yet or seen that
 7      document yet, but that is after, you know, the meet and
 8      confer process and continued searching what we located and
 9      we have produced at this point.
10                   THE COURT:  Do you have Bates numbers for this
11      document to help Mr. Carson find it in the 300,000 pages?
12                   MS. CHEEK:  I do not have the Bates number
13      offhand, but I am happy to send it to Mr. Carson later
14      today.
15                   THE COURT:  Okay.  I will take that as a
16      promise.
17                   MR. CARSON:  Can I ask a question about that
18      document or --
19                   THE COURT:  Well, you can ask a question, but --
20      go ahead.  Go ahead.
21                   MR. CARSON:  It was -- I take it it's a single
22      document.  I believe Ms. Cheek described it as a summary of
23      testing that was being done.  That suggests to me that, you
24      know, there are underlying testing documents that --
25                   THE COURT:  Actually, it sounds like a
```

1    procedural book --

2              MR. CARSON:  Okay.

3              THE COURT:  -- but how do I know.  So Ms. Cheek,

4    is the thing that you produced, is it kind of like the

5    company's policies for testing, or is it actually what

6    testing?

7              MS. CHEEK:  It's not policies.  I think I called

8    it a compilation, but it is sort of a listing of testing and

9    then followed by a more detailed report of the testing.  So

10   it is a single lengthy document that's essentially a report

11   of testing that was conducted.  And my guess is that most of

12   it is not going to be something that Guest Tek is interested

13   in.  If they find things in there and believe that there may

14   be more information on, you know, particular tests that they

15   are interested in, we could certainly consider conducting

16   more detailed searching for, you know, a particular test,

17   but we believe it's a fairly comprehensive document.

18             THE COURT:  Okay.

19             MR. CARSON:  So Your Honor --

20             THE COURT:  Yes, Mr. Carson.

21             MR. CARSON:  Just -- I'm sorry.  I apologize.

22   One last point.

23             So you know, I think Nomadix is well aware of

24   the particular functionality that's at issue in this case,

25   the features that we've identified.  And so you know, this

1    is the sort of piecemeal, we'll give you one document, you

2    know, and a bunch of other documents.  And then if you find

3    it, and you look through it, and you see a reference to

4    another document, we'll come back to it, and we'll go look

5    for that.  They know the functionality we're interested in.

6              I appreciate that they've got this compilation

7    of testing that covers all sorts of things, not just what

8    we're interested in, but I think they're capable of, you

9    know, doing their due diligence and collecting documents,

10   reviewing that, seeing if it refers to additional testing

11   and providing that to us, particularly given where we are in

12   the schedule.

13             THE COURT:  Okay.  Well, thank you.  You know,

14   when the documents are produced at 12:30 a.m., which means

15   that only one side even knows what we're talking about --

16   and I'm not blaming Ms. Cheek for this -- you know, this

17   procedure of how to resolve these disputes doesn't work so

18   well because it's hard to evaluate.  And I can't get

19   anything other than speculation from Mr. Carson.

20             So basically I'm not going to say they know what

21   you're looking for, and they need to follow up on it.  You

22   look at what they've produced, which Ms. Cheek is going to

23   do what she said and tell you exactly where it is, and you

24   all talk about it and see whether there's something else

25   that is reasonably necessary to do.

1               You know, from my point of view, what you are

2    trying to find out here is whether or not Nomadix tested the

3    functionality which is the functionality that you've

4    accused.  If they did, I'm not sure how much more followup

5    is needed.

6               So in any event, let's move on here.  As I

7    understood it, this source code computer issue, a few days

8    ago Nomadix sent it back to Guest Tek.

9               So is that kind of resolved for the time being?

10              MR. CARSON:  If I could address that, Your

11   Honor.  It was sent back.  I believe we received it Friday

12   of last week.  And they had it in their possession nearly

13   two months.

14              The issue, though, is that we've got the

15   computer back, but we're not able to allow our experts to

16   view the code.  We had an agreement from Nomadix a few

17   months ago that while there were stay-at-home orders in

18   place, we could ship the computer to our experts' home where

19   they could review it there.

20              The stay-at-home orders have been lifted, but

21   the travel concerns that our experts legitimately have --

22              THE COURT:  Well, so I get your point of view

23   there, Mr. Carson.

24              Mr. Lezama or Ms. Cheek, is there any reason why

25   this procedure that was good enough a few months ago

1    shouldn't be continued at this point, notwithstanding the

2    fact that maybe there are no stay-at-home orders anymore?

3              MS. CHEEK:  Yes, Your Honor.  I think you can

4    certainly appreciate that at the time the initial

5    stay-at-home orders were issued, none of us anticipated that

6    this many months later we would still be in this position.

7    And so while we did, you know, try to make sort of

8    extraordinary accommodations for a way that we would not

9    normally handle our source code, we don't think it's

10   appropriate to continue that long term.  As you know, these

11   are referred to as the crown jewels of the company, and

12   Nomadix goes to great lengths to protect its source code.

13             During our most recent meet and confer, Guest

14   Tek's counsel had proposed a potential alternative, and I

15   wasn't clear whether this would, you know, satisfy them or

16   just something that they were putting out there for

17   discussion, but suggesting that they could ship the source

18   code to their offices in different cities which they seem to

19   have an office located in the same city as all of their

20   experts.

21             And I think with appropriate parameters and

22   restrictions, understanding, you know, where the source code

23   is located at any given time and that it's otherwise being

24   maintained as required by the protective order, you know, in

25   a locked room and in their outside counsel's office, I think

1     that's something that we are amenable to.

2              It looks like one of their experts is in Seattle

3     where the source code has been maintained since we

4     originally produced it.  And I believe their other experts

5     are in Chicago and Los Angeles where Guest Tek's outside

6     counsel also has offices.

7              So I think there are a few details to work out

8     about that, but if that's still an offer that Guest Tek is

9     making, that's a potential compromise that we could reach.

10             THE COURT:  Mr. Carson.

11             MR. CARSON:  Yes, we did propose that as a

12    fallback a couple weeks ago during a meet and confer.  We

13    had not heard back yet until today, but our view is that

14    under the current protective order, you know, it doesn't

15    preclude our doing that, our sending the code to our Chicago

16    office for viewing by our expert there, our LA office, and

17    our Seattle office.  And we ask that Nomadix confirm that

18    that's their reading of the protective order, that it

19    wouldn't preclude that sort of an arrangement.

20             THE COURT:  Well, that sounds like what

21    Ms. Cheek just said would be okay; right?

22             MR. CARSON:  She did.  I think she suggested we

23    needed some further sort of agreements in addition to the

24    protective order.  If I misunderstood her and we're able to

25    go ahead with that, assuming that the parties adhere to the

 1    current protective order, then we're prepared to proceed in

 2    that manner.

 3             THE COURT:  Ms. Cheek.

 4             MS. CHEEK:  Yes.  I think we're generally in

 5    agreement.  I believe -- I don't have the protective order

 6    in front of me, but I believe it kind of refers to outside

 7    counsel of record.  And I don't know whether they have

 8    counsel of record in those other offices.  I think we would

 9    just want someone designated who is sort of responsible for

10    the source code and where it's located that has at least,

11    you know, read and agreed to abide by the restrictions in

12    the protective order as far as maintaining the source code

13    and in those offices as the protective order requires.  But

14    otherwise, I don't think we have any significant

15    disagreement on what the protective order permits.

16             THE COURT:  Now, Mr. Carson, getting somebody in

17    each of your offices to sign the order and to do their duty,

18    you can live with that?

19             MR. CARSON:  Yes, definitely.  We can work with

20    that.

21             THE COURT:  Okay.  Well, then I'm going to

22    construe the order based on your joint representation as

23    permitting it, and so that matter is resolved.

24             All right.  And so then there's the close of

25    fact discovery issue, but let's save that until we now look

 1    at Nomadix.  All right.

 2            So Nomadix has an interesting proposed order

 3    because the first thing they want to do is to say there's a

 4    date for final infringement contentions, and the plaintiff

 5    has to live with their final infringement contentions which

 6    is generally what I would understand to be meant by final

 7    infringement contentions.

 8            And so, Mr. Carson, recognizing that maybe

 9    September 10th is not that date, when are you prepared to

10    provide final infringement contentions or to commit to

11    providing --

12            MR. CARSON:  Well, Your Honor, it depends on

13    what the close of fact discovery ends up being.

14            THE COURT:  Okay.  Well, say it in relation to

15    that.

16            MR. CARSON:  With respect to the October 30th

17    deadline, you know, we would want a few things before we

18    supplement.  We need to review the documents that were just

19    produced.

20            THE COURT:  Yes.

21            MR. CARSON:  We need to review the new source

22    code, and we would need to depose their individuals which

23    we've not done thus far because we don't have the documents

24    that we needed.  So you know, we would propose to supplement

25    and finalize our contentions before the close of fact

1    discovery toward the end of October.

2              And I would point out that, you know, we've

3    never -- the parties have never built in a "final

4    contentions date."  I think in the normal course, absent

5    that date, the final date is the close of fact discovery.

6    If you don't supplement your contentions and the

7    interrogatories that go to those contentions by that date,

8    well, then you're stuck with whatever the current

9    contentions have to say.  But we're not opposed to --

10             THE COURT:  One of the problems with the final

11   date being October 30th is exactly what the defendants

12   identify which is you say a bunch of new things for the

13   first time and what can they do about it?

14             MR. CARSON:  Well, I mean, expert reports will

15   follow that.

16             THE COURT:  Yeah.  Yeah.  But the point is

17   sometimes your contentions deserve fact discovery.  I mean,

18   to the extent it's just an argument between the parties, I

19   mean, yeah, there's no harm.

20             So let me just ask:  Are all the lawyers who are

21   in this case, who I take it none of you are members of the

22   Canadian bar, are you all tied up in this Canadian trial, or

23   is it just your clients that are tied up in the Canadian

24   trial?

25             MR. CARSON:  Your Honor, it's our clients that

1   are tied up in the Canadian trial.  The attorneys involved

2   in those cases are based in Canada.

3            MR. LEZAMA:  So for Nomadix, though, we do

4   expect that U.S. counsel will be, you know, involved in

5   strategy and discussions with the Canadian counsel and --

6            THE COURT:  Are you expecting to be in Canada

7   for the trial?

8            MR. LEZAMA:  No.  We will not be going -- the

9   Canadian trial will be -- my understanding is that it will

10  be entirely remote.

11           THE COURT:  Okay.  All right.  So it's

12  September 3rd.  I think you can come up with final

13  infringement contentions tentatively by October 16th.  And

14  you know, if there's some problem because of depositions, or

15  something else, or you learn something in a deposition after

16  October 16th, you know, that could be the good cause you're

17  looking for.  But if you've got the source code, which

18  theoretically you do now, and maybe you've got another

19  300,000, I don't know whether it's documents or pages, but

20  you've got a lot more paper to look at.  And I do generally

21  think that your infringement contentions ought to be fairly

22  well set by October 16th or it ought to be something that

23  you can produce by then.  So I'm going to basically change

24  the date from September 10th to October 16th and sign off on

25  that one.

```
 1                    The next thing is these interrogatories two,
 2      five and seven.  And I looked at --
 3                    MS. YING:  Your Honor, this is Jennifer Ying.
 4      If we could go back to the contentions issue.  To the extent
 5      that we're required to provide final contentions on
 6      infringement, typically you also see final invalidity
 7      contentions as corresponding as well to.  When would Your
 8      Honor propose --
 9                    THE COURT:  What would you propose, Ms. Ying?
10                    MS. YING:  You know, I think I would -- I guess
11      we could talk about it with Nomadix, but I think it makes
12      sense that if we're going to be required to provide our
13      final infringement contentions, that similarly final
14      invalidity contentions would be set before the close of fact
15      discovery as well.
16                    THE COURT:  Mr. Carson.  Or no, you're on her
17      side.
18                    Mr. Lezama or Ms. Cheek.
19                    MR. LEZAMA:  Yeah, that's fine.  I do want to
20      just briefly note I think Ms. Cheek lost connection, so
21      maybe give her a minute to rejoin, but I can handle this
22      topic.  You know, we are fine with providing final
23      invalidity contentions on similar terms, but we would like
24      sufficient time to review the infringement contentions and
25      respond accordingly.  You know, I would suggest that at
```

```
 1    least four weeks --
 2              THE COURT:  Well, so --
 3              MR. LEZAMA:  -- to do that.
 4              THE COURT:  -- if you do four weeks, then you're
 5    like into -- I mean, you mean four weeks from when they do
 6    theirs, not four weeks from today; right?
 7              MR. LEZAMA:  Correct.
 8              THE COURT:  So yeah, four weeks from when they
 9    do theirs is like, you know, two weeks after fact discovery
10    closes.
11              MR. LEZAMA:  If we're setting it at
12    October 30th, yes.
13              THE COURT:  Okay.
14              MR. LEZAMA:  I mean, I think there's got to be
15    some allowance for --
16              THE COURT:  No, I agree.  So here's actually
17    what we can do:  I'm going to make your deadline
18    October 30th, but I'm going to say that the fact discovery
19    can go on for two weeks after that.  You can tighten up a
20    little on expert discovery and still allow me plenty of time
21    to decide your motions.  But you ought to -- you know, it's
22    less important generally for invalidity contentions unless
23    you're actually dealing with discovery of, you know, a
24    system or something as opposed -- and maybe you are, I don't
25    know -- as opposed to just prior art that's paper
```

1    publications and, you know, discovery doesn't actually

2    usually matter.

3              But two weeks is enough.  And you can have two

4    weeks of discovery after that.

5              So interrogatories two, five and seven --

6              MR. CARSON:  Your Honor, I apologize.  If I

7    could just address one other issue with the extension.

8              Another condition that they placed on an

9    extension was that we would not be entitled to any further

10   written discovery.

11             THE COURT:  Yeah.  I think that's a reasonable

12   thing.  You have enough problems with the written discovery

13   that's already out there.  You know, I would distinguish

14   that a little bit from particular follow-up discovery that

15   comes from doing a Rule 30(b)(6) deposition or something

16   else, but no more just general interrogatories or requests

17   for production of documents.

18             MR. CARSON:  The only thing that I have in mind

19   are things that may come out of the 300,000-plus pages that

20   have just been produced.  I don't know what we may learn

21   from that.

22             THE COURT:  Well, I don't know what you may

23   learn from it, either.  So when you've actually reviewed

24   them and, you know, I understand you couldn't possibly have

25   reviewed them in time for this, you know, you can talk with

1   them.  But it is time to try to bring all of this to a head,

2   and so you should not count on getting any more written

3   discovery.  I would think that you've asked enough things

4   now so that anything that you actually want is at most

5   followup to discovery you've already requested.

6         Okay.  So the second thing was Nomadix wanted

7   Guest Tek to answer interrogatories two, five and seven

8   completely.  Besides for the fact that I don't order

9   complete responses because who knows what that possibly

10  means, I looked at that.

11         And interrogatory number two which wants

12  plaintiff to claim priority dates for every claim in the

13  three patents that are left that's after March 16th of 2013,

14  I just don't think that's a burden that's on the plaintiff,

15  and so I'm not going to make them respond to that, period.

16         Interrogatory number five which is a request

17  that plaintiffs identify third parties that practice the

18  patent which I take to be related to non-infringing

19  alternatives, I think the first thing is defendant needs to

20  identify what it thinks the non-infringing alternatives are.

21  And then plaintiff can, you know, say or not say if they --

22  you know, if they think that it's actually an infringing

23  alternative, well, then they can do a chart, a claim chart

24  showing why it's an infringing alternative.  But I'm not

25  going to make them respond to an interrogatory saying

1    identify every third-party product in the world that

2    practices the patents.

3            And so interrogatory number seven which is the

4    damages which I believe relates to the commercial success of

5    the OVI; is that right?

6            MR. CARSON:  Interrogatory seven asks for Guest

7    Tek's damages theory, in essence.  I don't have the exact

8    language, but it's not tied on OVI.  It's the next issue

9    that's the OVI issue.

10           THE COURT:  Okay.  Well, so the damages theory,

11   you know, I looked at.  To some extent, I started looking at

12   the interrogatories, but I don't recall actually seeing what

13   you had said about interrogatory -- what your current answer

14   is to number seven.

15           Do you have any actual information of any use in

16   response to interrogatory number seven yet?

17           MR. CARSON:  We -- not yet, Your Honor, and the

18   reason for that was because we didn't have the documents

19   that we thought we needed to --

20           THE COURT:  Well, so you know, that carries you

21   so far.  As I understand it, you're not pursuing a claim of

22   lost profits; right?

23           MR. CARSON:  That's right.

24           THE COURT:  And so presumably you are pursuing a

25   claim of a reasonable royalty which you don't know how many

1    units, or maybe you do.  But usually with the reasonable

2    royalty, I would think is that you have in mind some number

3    which is the percentage, multiply it against some product

4    which is how you're going to calculate a reasonable royalty;

5    right?

6              MR. CARSON:  It is, Your Honor, but that

7    analysis, as I'm sure you can appreciate, is caught up in

8    all sorts of issues of profitability and costs, and the

9    incremental value of certain features, all of which flows

10   from, you know, financial documents that we don't have.  And

11   I think also will flow, in part, from technical documents

12   that, you know, we received, I guess a day and a half ago at

13   midnight, 300,000 pages of which.  So it's a complicated

14   analysis, but --

15             THE COURT:  So I understand you, Mr. Carson.

16             Mr. Lezama, what exactly is it you're expecting

17   them to tell you at this point that would be helpful?

18             MS. CHEEK:  Your Honor.

19             MR. LEZAMA:  Go ahead.  I'm sorry.

20             MS. CHEEK:  Sorry, I'm back.

21             THE COURT:  You're back.

22             MS. CHEEK:  Sorry, Your Honor.

23             THE COURT:  That's all right.  We have these

24   technical problems.  You know, I've dropped off these calls

25   before so I'm pretty -- you know, I understand nobody's

1     dropping off intentionally.

2           Go ahead, Ms. Cheek.

3           MS. CHEEK:  Yeah.  So certainly we understand

4     that, you know, to the extent they believe they're going to

5     be relying on documents that we've either just recently

6     produced or have not produced yet, we're not seeking to

7     preclude them from updating their theories to address any

8     insight that they gain from those documents, but we also

9     find it hard to believe that they have no present theory on

10    what the reasonable royalty should be.

11          There, as you know, are a number of factors that

12    go into that analysis beyond Nomadix's profitability on the

13    products, including many things that should be in Guest

14    Tek's possession.  You know, their own documents, their own

15    licensing practices, their own view of the relevant market.

16          THE COURT:  Well, so let me ask:  Has Guest Tek

17    ever licensed these three patents before?

18          MS. CHEEK:  I don't know.  I'll let Guest Tek's

19    counsel answer that.

20          MR. CARSON:  I don't believe we have, but I'm

21    hesitant to give you a definitive answer.

22          THE COURT:  Okay.  Has Nomadix taken any

23    licenses to -- well, first off, just generally, I guess

24    you've been in business 20 years.  You must have taken some

25    licenses.

1        MR. LEZAMA:  I can respond to that.  We have

2    licensed our patents.  And as far as I'm aware, any patent

3    rights that we've received have been included in our

4    outgoing licenses and those have been produced.

5        THE COURT:  Okay.  So you have licensed some

6    things, Mr. Lezama, and you've taken some licenses.

7        MR. LEZAMA:  Yeah.  I don't know that they were

8    necessarily termed licenses, but they may have been

9    covenants not to sue, things like that.

10        THE COURT:  Okay.  And you've produced that so

11    plaintiff has that?

12        MR. LEZAMA:  Yes.  Correct.

13        THE COURT:  All right.  Well, here is what I

14    think is I think plaintiff by October 15th or 16th, the

15    date, that I think they ought to supplement that

16    interrogatory with some theory that is your best effort at

17    the time, you know, which may in the end -- the actual

18    royalty number may not be -- it may not be worth the paper

19    it's printed on, but it seems to me that to the extent that

20    plaintiff has factual information that they think goes into

21    the royalty analysis, they ought to say what it is even if

22    it's incomplete.

23        So I am going to direct you to supplement your

24    answer.  I don't expect a complete answer, but I do expect

25    that it should be something other than just a complete

1    mystery as to what your theory is.  And I can't be anymore

2    specific than that.  That's the reason why I'm just going to

3    say you need to supplement your answer.  But how you

4    supplement it in the end is a question for you to figure

5    out.

6              All right?

7              MR. CARSON:  Yes, Your Honor.

8              THE COURT:  Okay.  So there was this question

9    about OVI source code which, as I understand it, plaintiff

10   said, well, we don't know whether we have the complete

11   source code for 2010 or 2011 OVI, but we'll look around for

12   it.  And if we have it, we'll produce it.

13             Is that where we are?

14             MR. CARSON:  Not exactly, Your Honor.  So the

15   document request asked for source code for all of Guest

16   Tek's patented instrumentalities, and that term was defined

17   in the request.  And so we've read that to, I think,

18   reasonably seek source code for which we believe has

19   functionality that falls within the scope of the asserted

20   patents.  And so we have produced OVI source code, 80

21   versions of that going back to 2012.

22             Now, as I understand it, there was a launch in

23   early 2011 and we do have -- and that launch, as I

24   understand it, did include some of the functionality that's

25   captured by these asserted patents.  And we do have OVI

1   code.   In addition to those 80 versions, we've been able in

2   the last couple of days to find some code from 2011.   And

3   we're certainly willing to produce that code as well which

4   we believe falls within the scope of that request.

5          I believe, though, what Nomadix is looking for

6   is code that's older than that, older than the early 2011

7   launch, and that is code that we have not agreed to produce.

8   My understanding is that the OVI product launched in 2011.

9   So to the extent they're looking for code that predates

10  2011, it would be code for a predecessor product with a

11  completely different name.

12         And two responses to that, if I've characterized

13  their requests accurately.   Number one, I don't think the

14  request asks for that because it's not a Guest Tek patented

15  instrumentality.   It's some older code that we've got that

16  they think might be prior art in some way.   I'm not sure.

17         But to the extent that's their theory, they've

18  never alleged that in their complaint or in their invalidity

19  contentions.   They've never put forth any sort of, you know,

20  reasonable basis for asserting that that older product is

21  prior art based on user guides, publicly available

22  documents.

23         And as Ms. Cheek, you know, suggested earlier,

24  source code is very sensitive.   You know, it's the crown

25  jewels of the company.   We don't know why -- so we don't

1   feel like we should have an obligation to produce source

2   code if they've not even made a good faith allegation that

3   it's relevant in any way to their case.  So we're willing to

4   go back and produce the 2011 versions that we've recently

5   found, but we don't think the request extends to older

6   products, and we don't think, even if it does, that they're

7   entitled to that code.

8             THE COURT:  Mr. Lezama or Ms. Cheek.

9             MS. CHEEK:  Yes, Your Honor.  So I think

10  Mr. Carson does characterize the dispute accurately except

11  that what we are also looking for in addition to the 2011

12  code is the 2010 code which we believe is OVI Version 5.

13  They may have other names for that product as well, but I

14  believe that's been, you know, covered in other litigation

15  between the parties that there is earlier OVI versions,

16  specifically OVI Version 5 that we believe was available in

17  approximately 2010 and that we believe we're entitled to to

18  evaluate whether that version also falls within the scope of

19  the asserted claims.

20          MR. LEZAMA:  Can I also add just one point?  So

21  yes, definitely, you know, the product that was available in

22  2010 is referred to by Guest Tek in its own documents as OVI

23  Version 5.  In addition, we have OVI Version 5 series code.

24  It's like 5. -- I don't know -- 5, 6, or something like that

25  from 2011.  So the likelihood that there is, you know, some

1    super sensitive trade secret that we're going to obtain by

2    looking at, you know, the version of OVI 5 from 2010, you

3    know, is extremely low.  I mean, you know, the likelihood is

4    that there are going to be only incremental changes from

5    2010 to 2011.

6            As Mr. Carson has mentioned, we have over 80

7    versions of source code produced.  And just to be clear,

8    that was produced in the California case.  We've agreed it

9    can be used in this case, but it's not like it was produced

10   for this case.

11           And you know, this goes to prior art.  They've

12   contended that OVI falls within the scope of the claims, and

13   we're just looking to see whether there's been a 102(b)

14   on-sale bar, and we can't know that until we see the source

15   code.

16           MR. CARSON:  Your Honor.

17           MR. LEZAMA:  I don't think it's fair to impose a

18   condition that we make some sort of, you know, allegation in

19   a pleading subject to Rule 11 when, you know, we can't

20   really make that allegation until we see the source code.

21           MR. CARSON:  Your Honor, if I could respond to

22   that.  So it's news to me that they've got the 5.6 code.  I

23   guess it was produced to them in the California case.  If it

24   was produced to them in the California case, it was produced

25   to them at least two years ago, if not more, and they've

1    certainly had plenty of time to analyze that source code and

2    put forth some sort of basis for asserting that, not only

3    that 5.6 code, but earlier versions of that code meet the

4    limitations of the patent.  And they've not provided any

5    such analysis.  So --

6              THE COURT:  So I get what you say there.  So

7    Mr. Lezama, 5.6, you have that code?

8              MR. LEZAMA:  Just to be clear, I made 5.6 up.  I

9    don't know what the precise version number is.  It's --

10             THE COURT:  Well, the earliest version that you

11   have, does it meet the limitations of the patent?

12             MR. LEZAMA:  We hadn't looked at it for that

13   reason because it's too late, you know, as far as we

14   understand.  I mean, it's -- you know, why would we have

15   looked at it for this case and for that purpose.

16             THE COURT:  Well, in other words, you keep

17   asking -- you're saying you'd like to look at the 2010

18   because you think it would be -- there wouldn't be that much

19   change, but apparently you don't even know whether the more

20   recent versions have the functionality that's at issue;

21   right?

22             MR. LEZAMA:  Well, I mean, the thing is that

23   it's -- you know, we're not necessarily contending that any

24   of the versions have them.  Guest Tek is the one who said

25   that OVI falls within the scope of the claims, and they

1    haven't really explained why they think that's the case.

2                  THE COURT:  Well, so --

3                  MR. LEZAMA:  But we want to be able to take a

4    look at the older code and compare it to the code that, you

5    know -- the versions that they do contend practice the

6    claims and compare them.  And we -- it may not be our

7    position that the claims should be construed the way that

8    Guest Tek is reading them, but we may have a position that,

9    well, if this satisfies the claims, then the prior art

10   device does.

11                 THE COURT:  Well, so construction of the claims

12   is something that I have already done, so you know, you all

13   arguing about how you can construe the claims, that's

14   supposed to have been resolved.

15                 So you're telling me, Mr. Lezama, you have no

16   current invalidity allegations of an on-sale bar; is that

17   right?

18                 MR. LEZAMA:  With respect to OVI, I don't

19   believe so.

20                 THE COURT:  Okay.  Well, then I'm not going to

21   require that they produce the 2010 source code because

22   essentially it's pursuing an invalidity theory that's not in

23   the case.  And so I'm not going to require them to do that.

24                 And I think the last thing --

25                 MR. LEZAMA:  Can I interrupt for just a moment?

1    I take it that if we do conclude we have a basis to make

2    that allegation and make that allegation, they should

3    produce the source code?

4              THE COURT:  Well, that would be a different

5    thing, but you know, probably a good idea that I only rule

6    on actual disputes, not hypothetical disputes.

7              So the last thing on the list here is that

8    there's a request for production, Items 30 and 37, which

9    relate to financial documents relating to, I guess, sales of

10   OVI at some relevant time because plaintiff says that that's

11   a commercial embodiment of the patents.

12             Is it right, Mr. Carson, that OVI, at least at

13   some point, is a commercial embodiment of the patents, in

14   your view?

15             MR. CARSON:  Yes, we have made that

16   representation.

17             THE COURT:  Okay.  And so I thought I saw

18   actually that you said you were going to produce financial

19   documents about the profitability and commercial success of

20   OVI; is that right?

21             MR. CARSON:  That's right.  We're looking for

22   those documents.  We believe that we found some documents

23   that are responsive.  Our understanding from Nomadix from

24   the meet and confer, based on the fact that we're not

25   seeking lost profits, only a reasonable royalty is that

1    they've agreed to narrow their requests.  They're not

2    seeking all financial documents which is what they were

3    looking at before, but just high-level documents that would

4    provide information on revenue and cost with respect to the

5    OVI products.  And those are the type of documents that we

6    believe we've located and are preparing to produce.

7                    THE COURT:  And how far back are you producing

8    them?

9                    MR. CARSON:  I don't have the answer to that off

10   the top of my head.  I apologize for that, Your Honor.  I

11   don't have an answer for you.  I don't know how far back

12   they go, and I don't know how far back our data goes.

13                   THE COURT:  Okay.  So you say you think you

14   found some documents.  When are you going to produce these

15   documents?

16                   MR. CARSON:  Well, they were just sent to me

17   today, so we've got to look at them and make sure that

18   they're responsive and they're narrowly tailored, but I

19   think certainly by next week we'll be able to produce them.

20                   THE COURT:  Okay.  Anymore comment on that?

21                   Ms. Cheek.

22                   MS. CHEEK:  Yeah, just one followup.  Thank you,

23   Your Honor.

24                   We would be interested in them understanding

25   where they are drawing the line to the extent that they are

1    searching and locating documents that they are deciding they

2    don't need to produce because they think they are too

3    detailed or too comprehensive.  You know, we still think

4    those documents are relevant to the reasonable royalty

5    analysis, and they haven't identified any burden in

6    producing them.  And so we're just interested in what line

7    they're drawing as far as what they are producing and what

8    they are withholding.

9           THE COURT:  Yeah.  Well, I'm not sure that

10   Mr. Carson at this point could say what they're withholding

11   because he hasn't looked at the documents.  And absent him

12   saying whatever his request was, which probably is protected

13   by some kind of privilege, I'm not sure that we can make a

14   whole lot more progress on that right now.

15          MS. CHEEK:  I guess we would just want to

16   reserve the right to, you know, seek further discovery

17   depending on what they produce.

18          THE COURT:  Well, so basically, though, what

19   you're looking for for the OVI is you're looking for, I

20   assume, how many units are sold and what the profitability

21   is.  And if you get those two things, isn't that pretty much

22   going to tell you what you need for reasonable royalty and

23   tell you also whether or not there's an argument for or at

24   least a financial part of an argument for commercial

25   success?

1          MS. CHEEK:  Yeah.  I think at a high level,

2     those are -- that's the type of information we're looking

3     for.  You know, certainly the more detail on what goes into

4     their profitability, you know, the more helpful it could

5     potentially be to the analysis.  And so we are, you know,

6     interested.  If they have more comprehensive documents that

7     they're just not planning to produce, we don't think that's

8     appropriate.

9          THE COURT:  Well, so I guess you two have to

10     talk to each other a bit.  You know, there was something in

11     the briefing and you -- at least one, maybe both of you have

12     sort of referred to it as you've had some discussions about

13     what's reasonable to produce in relation to this issue.  And

14     it sounds like you don't have a final agreement, but I think

15     that if you talk to each other, I don't think the documents

16     have to be incredibly detailed to give you, Ms. Cheek, what

17     you need or I suppose for Mr. Carson to be able to give to

18     his expert for that expert to offer reasonable opinions or

19     fact-based opinions.

20          I don't know.  Is there something else one or

21     the other side wants me to do about this right now?

22          MR. CARSON:  Your Honor, I think this falls into

23     the category of a hypothetical dispute.  I think, you know,

24     we've got some documents that we think are consistent with

25     our meet and confer discussion, and again, we'll be

1    producing those here.

2                THE COURT:  So, yeah, you said you're going to

3    produce them shortly.  It's practically the end of the week

4    now.  So if you produce them next week, that is pretty

5    shortly.  And presumably there won't be 300,000 of them, and

6    so Ms. Cheek will have an opportunity to look at them and

7    figure out whether it gives her what she needs.  So why

8    don't we leave it at that.

9                All right.  So I think we've touched on pretty

10   much everything that's in these two letters.  What I would

11   appreciate for the parties to do, because in the give and

12   take of these discussions, I'd like you to try to reduce

13   what I've said to some kind of jointly understood order that

14   I will sign so that if there's an argument about what I've

15   said, and you know, I hope there won't be, but it's not

16   beyond the realm of possibility, that there will be some

17   order signed by me that says how I've resolved all these

18   various disputes.

19               So if you all can also meet and confer about

20   that and submit something some time next week, I would

21   appreciate it.  And I guess in terms of the just general

22   overall schedule of discovery cutoff being November, I think

23   I said -- I'm not sure what I said, but I think if

24   October -- you know, two weeks beyond whenever it was that

25   you all -- October 30th.  So that's probably about

1    November 13th or something like that.  And if you work out

2    whatever, your expert discovery and, you know, the rest of

3    the schedule, if you would submit something on that, too,

4    that would be good.

5              All right?  Are we done?

6              MR. CARSON:  Yes, Your Honor.  Thank you.

7              MR. LEZAMA:  Yes.  Thank you, Your Honor.

8              MS. CHEEK:  Thank you, Your Honor.

9              MS. YING:  Thank you, Your Honor.

10             THE COURT:  Okay.  Well, thank you all.

11   Hopefully, I won't see you again for a while.  But in any

12   event, I'm going to hang up now and have a nice day.

13             (Discovery dispute videoconference was concluded

14   at 3:22 p.m.)

15             I hereby certify the foregoing is a true and

16   accurate transcript from my stenographic notes in the

17   proceeding.

18             /s/ Heather M. Triozzi
               Certified Merit and Real-Time Reporter
19             U.S. District Court

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on September 29, 2020, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed.

I further certify that on the same date the attached document was electronically mailed to the following person(s):

Jack Blumenfeld
Jennifer Ying
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, Delaware 19899
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Plaintiff*
*Guest Tek Interactive Entertainment Ltd.*

Daniel J. Goettle
BAKER & HOSTETLER LLP
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104
dgoettle@bakerlaw.com

Charles C. Carson
Jeffrey W. Lesovitz
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW, Suite 1100
Washington, DC  20036
ccarson@bakerlaw.com
jlesovitz@bakerlaw.com
Guest-Tek@bakerlaw.com

Michael J. Swope
BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104
mswope@bakerlaw.com

Andrew Samuels
BAKER & HOSTETLER LLP
200 Civic Center Drive
Suite 1200
Columbus, OH 43215
asamuels@bakerlaw.com

*Attorney for Plaintiff*
*Guest Tek Interactive Entertainment Ltd.*

Dated: September 29, 2020

_/s/ Kenneth L. Dorsney_
Kenneth L. Dorsney (#3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com

*Attorneys for Defendant Nomadix, Inc.*